UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **LATICIA MARTINEZ,**<br><br>Plaintiff,<br><br>vs.<br><br>**THE SCHOOL DISTRICT OF THE CITY OF WYANDOTTE, RONNY JAMES SHEELER, JR., THOMAS DESANA, and MARTIN JANESKI,**<br><br>Defendants. | **2:23-CV-12714-TGB-CI**<br><br>HON. TERRENCE G. BERG<br><br>**ORDER GRANTING DEFENDANTS THE SCHOOL DISTRICT OF THE CITY OF WYANDOTTE, THOMAS DESANA, AND MARTIN JANESKI'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 36)** |

This is a disturbing case regarding a student's claims that she was the victim of repeated harassment and sexual abuse by a school employee/coach in 2021 and 2022. After the employee's conduct was exposed, he was arrested, charged with several counts of criminal sexual conduct, plead guilty to two misdemeanor counts of criminal sexual conduct, and was sentenced to probation and fined. The student brought this lawsuit against her abuser, as well as the school district, an administrator, and a contract coach, asserting claims for violations of Title IX, constitutional claims under 42 U.S.C. § 1983, and state law claims.

Now before the Court is Defendants The School District of the City of Wyandotte, Thomas Desana, and Martin Janeski's joint Motion for Summary Judgment, seeking dismissal of the claims asserted against

1

them. The motion has been fully briefed, and a hearing was held on February 20, 2026, at which counsel for all parties appeared, and counsel for Plaintiff and the Defendants Wyandotte, Desana, and Janeski argued. The motion was taken under advisement. The Court now orders, for the reasons stated below, that Defendants' motion for summary judgment will be **GRANTED**.

## I.   BACKGROUND

Plaintiff Laticia Martinez was a student at Roosevelt High School ("RHS") in The School District of the City of Wyandotte ("Wyandotte") from September 2018 to May 2022. Deposition of Laticia Martinez at 15, 19, ECF No. 36-4, PageID.801–02. During that time period, Defendant Thomas Desana was "assistant principal in charge of athletics" and the "athletic director" at RHS, Deposition of Thomas Desana at 11, ECF No. 36-3, PageID.780, and Defendant Martin Janeski was contracted by Wyandotte as the head coach of the girls' bowling team at RHS. ECF No. 36-2. Defendant Ronny James Sheeler, Jr. was employed by Wyandotte as a "[n]etwork and core services administrator" at RHS starting in September 2018, and he became the head coach of the boys' bowling team at RHS for the 2020–2021 and 2021–2022 school years. Deposition of Ronny Sheeler, Jr. at 10-12, 30, ECF No. 36-5, PageID.865, 870.

Martinez was a member of the RHS girls' bowling team all four years she attended RHS. Martinez Dep. at 47, ECF No. 36-4, PageID.809. Martinez testified that she had no individual communications with

2

Sheeler during her freshman and sophomore years at RHS, *id.* at 113, PageID.827, and admits that "there were no inappropriate communications or physical contact between [herself] and Sheeler, nor any grooming or grooming behaviors by Sheeler" from September 1, 2018 through March 31, 2021. ECF No. 36-6, PageID.886–93.

In around April 2021 of her junior year of high school, when Martinez was 17-years old, Sheeler contacted Martinez for the first time through the Remind application[1] about an IT issue involving the wallpaper on Martinez's school-issued laptop computer. Martinez Dep. at 114–16, ECF No. 36-4, PageID.827–28. After that, Martinez and Sheeler began to communicate more through the Remind application about things such as Martinez's art projects or her new haircut. *Id.* at 115–18, PageID.827–28.

Beginning in approximately June of 2021, Martinez and Sheeler switched to communicating exclusively through a different communication application called Discord that was not affiliated with RHS and which allowed for voice, video, and text chats, where they could communicate via video calls while gaming. Martinez Dep. at 119–22,

---

[1]     Sheeler explained that the Remind application was one of the recommended communications applications used by the school district to communicate information between the school, teachers, coaches, students, and parents. Sheeler Dep. at 35–36, ECF No. 36-5, PageID.871. He testified that he set up a Remind group for the combined boys' and girls' bowling team members to communicate things such as team schedules and upcoming events. *Id.* at 48, PageID.874.

ECF No. 36-4, PageID.828–29. Their conversations started out mainly about video games, but evolved to include sexual innuendos, conversations about their private and personal lives, including Sheeler's sexual issues with his wife, Sheeler's requests for nude photos of Martinez, and eventually Martinez showing Sheeler her breasts and Sheeler masturbating on video in front of Martinez. *Id.* at 177–81, PageID.843–44.

Martinez began her senior year of high school at RHS in September 2021. She testified that Sheeler would come into her classes throughout the school year and sit at her table and talk about the bowling team. *Id.* at 186–89, PageID.845–46. Martinez's teachers similarly testified that Sheeler would come to their classrooms at times during the 2021-2022 school year when Martinez was in class and stand in the back of class or in the doorway, and at times talk to Martinez about upcoming bowling matches. Deposition of Jennifer Ferris at 31–37, ECF No. 36-12, PageID.1020–22; Deposition of Susi Stiles at 21–23, 28–32, ECF No. 36-13, PageID.1031–33. Stiles testified that she did not suspect that there was any inappropriate behavior between Sheeler and Martinez during that time period. Stiles Dep. at 33, ECF No. 36-13, PageID.1034.

Martinez admits that "the first instance of physical sexual contact between [herself] and Defendant Sheeler did not occur until November 2021," when Martinez was 17 years old. ECF No. 36-6, PageID.894. She testified while the entire bowling team was on the bus coming home from

4

a bowling meet, she was sitting next to Sheeler and Sheeler started rubbing her thighs and then digitally penetrated her vagina. Martinez Dep. at 77–79, 132–34, ECF No. 36-4, PageID.816–17, 832. She said that this then happened "almost every time [they] were on the bus" together during her senior year. *Id.* Martinez did not tell anyone that this was happening. *Id.* Martinez also testified that she was "attracted" to Sheeler "sexually" and that she and Sheeler exchanged sexual messages through the Discord application in January 2022, including about wanting to engage in sexual acts with each other. *Id.* at 156–59, PageID.838. Martinez did not tell anyone about her and Sheeler's relationship, their conduct, or their conversations. *Id.* at 101, 124–25, 134, 145, 151, PageID.822, 830, 832, 835–36.

Janeski testified that a parent complained to Janeski's wife at a bowling tournament on the last Sunday of January 2022 that she thought Sheeler was getting too close to the girls on the bowling team. Janeski also said that his wife thought Sheeler was "too chummy" with the girls' bowling team and that Sheeler was trying to undermine Janeski's position as coach of the girls' team and take the team away. Deposition of Martin Janeski at 62–64, ECF No. 36-7, PageID.914. The parent also reported to Janeski's wife that Sheeler was in a group chat with just the girls' bowling team members. *Id.* at 71, 85, PageID.916, 920. Janeski went to Desana's office to discuss these issues, and Sheeler walked in at the beginning of the meeting. *Id.* at 70–71, PageID.916. Janeski asked

5

Sheeler why he was in a group chat with the girls' team members and Sheeler said that the group chat was just "talking about practice times and stuff like that," and showed Janeski the chat on his phone. *Id.* at 71–72, PageID.916. Janeski said that after this meeting, Sheeler "backed off" for a while. *Id.* at 73, PageID.917.

Janeski also testified that he witnessed an interaction between Martinez and Sheeler at a team practice, after Martinez made two ten pin spares in a row, where Sheeler held up his fingers making a peace sign or indicating the number two, and Martinez walked past him and put her finger through the middle of his two fingers. Janeski Transcript, ECF No. 40-7, PageID.1255; Janeski Dep. at 58–59, ECF No. 36-7, PageID.913. Janeski testified that at the time of the incident, he did not think the interaction was inappropriate. Janeski Dep. at 66, ECF No. 36-7, PageID.915 (explaining that he found this exchange inappropriate only after he found out about Sheeler's assault of Martinez). In any event, Janeski does not contend that he told Danesa about this interaction, only that he told Danesa's administrative assistant, Page Sevcik. *Id.* at 66–67, PageID.915.

In February 2022, Janeski was out sick and he asked his friends, Jerry and Linda Sikora, to substitute coach the girls bowling team for him. *Id.* at 79–80, 82–84, PageID.918–19. Janeski warned the Sikoras not to let Sheeler interfere with the girls team because Janeski was worried that Sheeler would try to steal the team while Janeski was gone.

*Id.* The Sikoras confirmed that Sheeler did try to be involved with the girls team while they were coaching, but they would not let him. *Id.* Despite complaints that Sheeler was "too close" to the girls bowling team members and observing the "fingers gesture," when asked if "[a]t the time you were coaching … did you think that you saw anything sexual or inappropriate between Sheeler and [Martinez]," Janeski responded "No." *Id.* at 122, PageID.929.

Desana testified that he never received any communications from Janeski or parents "regarding Mr. Sheeler's behavior" and that he "was never told [Sheeler] was doing anything inappropriate" during this time period. Desana Dep. at 42, 50, ECF No. 36-3, PageID.788, 790. Desana did state, however, that Janeski complained to him on several occasions that he did not want Sheeler to "coach his girls" and that Sheeler was "interfering with his coaching." *Id.* at 44–46, PageID.788–89; *see also* Report of Detective Kenneth Groat, ECF No. 40-5, PageID.1242 (reporting that Desana said Janeski complained to him "4–5" times that Sheeler was too "chummy" with the girls bowling team members). Desana testified that he met with Sheeler and told him to stop interfering with the girls' bowling team. Desana Dep. at 50, ECF No. 36-3, PageID.790.

Martinez testified that on February 10, 2022, Sheeler sexually assaulted her in his office at the school. Martinez Dep. at 134–44, ECF No. 36-4, PageID.832–34. Martinez stated that she was "stressed out"

about an argument she and her then-boyfriend Jose Hinojosa were having, and that she went to Sheeler's office at the end of the school day to talk. *Id.* Sheeler turned the school cameras off so that no one saw her come into his office, and locked the doors once they were inside. *Id.* Martinez testified that she and Sheeler hugged and he kissed her neck. She did not tell him to stop. *Id.* Sheeler then knelt in front of Martinez, pulled her pants down, and digitally and orally penetrated her. *Id.* Martinez testified she either said "no" or "I don't know" when Sheeler asked, "can I?" and that she then "wanted it to be done, so [she] faked an orgasm." *Id.* Afterward, Martinez pretended to get a text from her father and said that she had to go. *Id.* Sheeler then unlocked the doors and Martinez left and went home. *Id.* She did not report what had happened to anyone. *Id.* at 145, PageID.835. After that, Martinez and Sheeler continued to communicate through the Discord application, but she tried to distance herself and reduce communications with him, and then eventually just stopped responding to his texts. *Id.* at 146–48, PageID.835–36.

Martinez didn't tell anyone what had happened on February 10, 2022 until she told her boyfriend Hinojosa on or around April 18, 2022. Martinez Dep. at 145–46, ECF No. 36-4, PageID.835. Hinojosa then told Assistant Principal Lisa Wojtowicz what was going on between Martinez and Sheeler. Deposition of Benjamin Reynolds at 47–48, ECF No. 36-9, PageID.977. Wojtowicz in turn informed Principal Benjamin Reynolds

that "Jose [Hinojosa] came to see her and was concerned about some things between" Martinez and Sheeler. *Id.* Reynolds interviewed Hinojosa and Martinez on April 19, 2022, and while Martinez initially claimed she made up a story about the assault, she, eventually "told [Reynolds] what happened[.]" *Id.* at 48–51, PageID.977–78.

After the interviews were completed, Reynolds called Wyandotte's "Central Office" and spoke with Tonya Brodie, the Wyandotte Human Resources Director, and Superintendent Catherine Cost. *Id.* at 52–53, PageID.978–79. The police were notified about the assault, and Cost testified that Sheeler was placed on leave and then voluntarily resigned on April 20, 2022. Deposition of Catherine Cost at 85, ECF No. 36-10, PageID.1007; Resignation Letter, ECF No. 36-11. Sheeler was charged with 3rd Degree Criminal Sexual Conduct ("CSC") with a student, and 4th Degree CSC with a student, and he eventually accepted a plea and was convicted on two counts of 4th Degree CSC with a student. Complaint ¶¶ 92–94, ECF No. 1, PageID.17; Sheeler Dep. at 16, ECF No. 36-5, PageID.866.

In addition, Desana was placed on administrative leave on May 6, 2022, after Cost saw a Facebook post by Janeski's wife indicating that Desana knew about the inappropriateness of Sheeler's conduct, and Desana subsequently retired in June 2022. Cost Dep. at 15–18, ECF No. 36-10, PageID.990–91; Desana Dep. at 6, ECF No. 36-3, PageID.779.

9

On October 25, 2023, Martinez filed suit against The School District of the City of Wyandotte, Thomas Desana, Martin Janeski, and Ronny Sheeler, Jr. ECF No. 1. Martinez asserts the following claims against the following parties: (1) violation of Title IX, 20 U.S.C. § 1681, as to Defendant Wyandotte; (2) violation of 42 U.S.C. § 1983, excessive force and unlawful seizure, as to Defendant Sheeler; (3) violation of 42 U.S.C. § 1983, equal protection under the Fourteenth Amendment, as to Defendants Desana and Janeski; (4) violation of 42 U.S.C. § 1983, failure to train and supervise (*Monell* claim), as to Defendant Wyandotte; (5) sexual battery, as to Defendant Sheeler; (6) gross negligence, as to Defendant Sheeler; (7) violation of the Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101, *et seq.*, as to Defendant Wyandotte; and (8) violation of Michigan Child Protection Laws, M.C.L. § 722.621, *et seq.*, against Defendants Wyandotte, Desana, and Janeski. *Id.*

Defendants Wyandotte, Desana, and Janeski (hereinafter referred to as "the Defendants") jointly moved for summary judgment on August 5, 2025. ECF No. 36.[2] The motion is fully briefed. ECF Nos. 40, 44.

## II.    LEGAL STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any

---

[2]    Defendant Sheeler has not moved for summary judgment on the claims asserted against him in Counts, II, V, and VI of Plaintiff's Complaint, and accordingly those claims against Sheeler will not be addressed in this Order.

affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); see also Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Instead, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient

factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252. For the Court to grant summary judgment, the evidence cannot be such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

## III.   DISCUSSION
### A. Title IX Claim Against Wyandotte (Count I)

Martinez alleges that Wyandotte violated Title IX of the Education Act of 1972, 20 U.S.C. § 1681 *et seq.* Complaint, Count I, ECF No. 1, PageID.18–25. Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Title IX contains an implied private right of action for monetary damages. *Gebser v. Lago Vista Ind. Sch. Dist.,* 524 U.S. 274, 280–81 (1998) (citing *Cannon v. Univ. of Chicago,* 441 U.S. 677 (1979)). "[A] school that receives federal funds can be held liable in damages [under Title IX] for a teacher's sexual harassment [or abuse] of a student if it is proven that the school had actual notice and exhibited deliberate indifference to the alleged harassment." *Wamer v. Univ. of Toledo*, 27 F.4th 461, 466 (6th Cir. 2022). Such an action requires a plaintiff to show that (1) an act of abuse or harassment occurred; (2) a school official with sufficient authority had actual notice of the abuser's misconduct, and

12

(3) the school district was deliberately indifferent to that misconduct. *Gebser,* 524 U.S. at 285 (a school district's liability under Title IX for sexual harassment of a student requires a plaintiff to show "an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct.").

Wyandotte does not dispute that an act of abuse against Martinez occurred. It instead argues that Martinez cannot establish that an "appropriate person" had "actual notice" of such a risk, or that it exhibited "deliberate indifference" to that risk, and so the Court must grant it summary judgment on Martinez's Title IX claims.

### 1. Actual notice

To establish actual notice of abuse under Title IX, Martinez must establish that an "appropriate person" had notice of that risk of abuse and "an opportunity to rectify any violation." *Gebser*, 524 U.S. at 290. "An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Id.* Defendants do not dispute that Desana is an "appropriate person" under Title IX. Martinez fails to show, however, that Janeski, a contract coach of the boys' bowling team with no supervisory authority over Sheeler, is an "appropriate person" under Title IX having authority to take corrective action to end the alleged discrimination. Indeed, Martinez instead focuses in her Response, and at

13

oral argument, on what Desana knew or what he was told. *See* ECF No. 40, PageID.1175 (focusing on "the content of what Janeski told Desana").

The Court's attention thus turns to determining whether there is a question of material fact as to whether Desana had actual knowledge that Sheeler posed a substantial risk of sexually abusing Martinez. To establish actual notice under Title IX in this case, it is insufficient merely to show that Defendants were on notice of some generally "inappropriate" behavior. *Gebser*, 524 U.S. at 291–92. Rather, the "appropriate person" must be on notice of a substantial risk of the *actual type of abuse* that would provide for liability under Title IX. *See id.* For example, in *Gebser*, the Supreme Court observed that a parent's complaint that a teacher made "inappropriate comments" during class was insufficient to alert a school official to the possibility that the teacher was engaged in a sexual relationship with a student. *Id.* at 292. Similarly, in *Henderson v. Walled Lake Consolidated Schools*, 469 F.3d 479 (6th Cir. 2006) the Sixth Circuit held that a teacher's "communications at odd hours, inappropriate counseling, unchaperoned off-campus activities and inappropriate interactions with team members" failed to "hint[ ] at the existence of a hostile environment." *Id.* at 490; *see also Doe v. Board of Educ. of Columbus City Schs.*, No. 2:23-cv-1006, 2025 WL 888461, at *8 (S.D. Ohio Mar. 20, 2025) (explaining that "[w]hen the teacher-to-student texts have sexual content *which an administrator knows about*, Courts have found the administrator knew of a 'substantial risk' to students," but "if an

administrator knows that a teacher has been texting a student *but neither knows about nor suspects any sexual content*, then the administrator does not know of a 'substantial risk,' even if some texts were in fact sexual.") (emphases added). Further, "[f]ederal courts have consistently held that Title IX requires 'actual notice,' not constructive notice," and thus "general allegations that the risk of sexual abuse should have been 'obvious'" or that "'it was [Defendants'] job to know' of the risk … fails as a matter of law to show that Defendants had actual notice." *Irvin v. Grand Rapids Pub. Schs.*, 366 F. Supp. 3d 908, 919 n.4 (W.D. Mich. 2016).

In support of her Title IX claim, Martinez contends that Desana admitted that Janeski told him that "he thought something was going on with [Sheeler], he's always hanging around the girls, coming to his practices when he doesn't need to, and he thought something inappropriate was happening." ECF No. 40, PageID.1176–77 (citing Deposition of Detective Kenneth Groat at 35, ECF No. 40-3, PageID.1220). Martinez asserts Desana further admitted that Janeski told him that "Sheeler was too chummy with the girls" and that one of the parents asked Janeski "why is Sheeler at the table with the girls showing them stuff on his phone and stuff." *Id.* (citing Groat Dep. at 36, ECF No. 40-3, PageID.1220). Martinez further asserts that Janeski told Desana that he did not want Sheeler around "my girls" and that a parent reported that Sheeler was in a group chat with the girls' bowling team

15

members. *Id.* (citing Janeski Interview Transcript, ECF No. 40-7, PageID.1256–57). Desana testified that because Sheeler managed transportation for both the girls' and the boys' bowling teams, he was on a group text with both teams. Desana Dep. at 45–46, ECF No. 36-3, PageID.789 (stating that Sheeler "pulled out his phone" to show Janeski that he was included on the group text as well).

Martinez further asserts that Janeski witnessed an interaction between Martinez and Sheeler at a team practice, after Martinez made two "ten pin [spare]s" in a row, where Sheeler "h[e]ld[] up his fingers [making a peace sign or indicating "two"] and [Martinez] walk[ed] past him and put[] her finger right through the middle of his finger[s]." ECF No. 40, PageID.1165 (citing Janeski Transcript, ECF No. 40-7, PageID.1254). Janeski testified that at the time of the incident, he did not think the interaction was inappropriate. Janeski Dep. at 66, ECF No. 36-7, PageID.915 (explaining that he found this exchange inappropriate only after he found out about Sheeler's assault of Martinez).[3] In any event, Janeski does not contend that he told Danesa about this interaction, only that he told Danesa's administrative assistant, Page Sevcik. *Id.* Desana testified that he was not aware of this incident.

---

[3]     While Martinez asserts that "Sheeler confirmed the gesture meant intercourse," ECF No. 40, PageID.1177 (citing Sheeler Dep. at 56, ECF No. 36-5, PageID.876), "[w]here a school district's liability rests on actual notice principles, however, the knowledge of the wrongdoer himself is not pertinent to the analysis." *Gebser*, 524 U.S. at 291.

Desana Dep. at 46–47, ECF No. 36-3, PageID.789. Martinez therefore fails to show that Desana had "actual knowledge" of this incident.

At the hearing, Plaintiff's counsel contended that the "cumulative effect" of five instances over about a six week period before Martinez was sexually assaulted by Sheeler was sufficient to provide "actual notice" to Desana that Sheeler posed a substantial risk of sexually abusing Martinez. In addition to (1) Janeski reporting to Desana that Sheeler was "too chummy" and acting inappropriately with the girls bowling team members; and (2) the "fingers gesture" between Sheeler and Martinez at bowling practice discussed above, Plaintiff's counsel also contended that (3) Janeski said that Sheeler's actions were "way over the line for a Coach/Player relationship"; (4) Desana "blew off" Janeski's complaints about Sheeler and said "if anyone is messing around with the girls it was Janeski"; and (5) Janeski warned the volunteer coaches (the Sikoras) to keep Sheeler away from the girls bowling team. Plaintiff complained that Desana did nothing in response to these occurrences.

However, Janeski made the statement that Sheeler's actions were "way over the line for a Coach/Player relationship" in his written statement to Detective Groat *after* he had learned about Sheeler's and Martinez's relationship. Janeski Statement, ECF No. 40-6, PageID.1245. Janeski did not make that statement to Desana. In fact, Janeski agreed at his deposition that before he learned of the sexual assault, he did not believe anything sexual or inappropriate was happening between

17

Martinez and Sheeler, and that he did not see anything inappropriate or of a sexual nature between Sheeler or any other student. Janeski Dep at 122, ECF No. 36-7, PageID.929.

Further, contrary to Plaintiff's counsel's representation at the hearing, Sheeler did not state that Desana "blew off" Janeski's complaints about Sheeler and said that "if anyone is messing around with the girls it was Janeski." Rather, Sheeler testified:

> The outcome of that meeting was when Mr. Janeski left, I spoke to Mr Desana about it, in regards to it, and he pretty much just blew it—kind of—well, I wouldn't say blew it off. Kind of made a comment about how he would—I believe that Mr. Janeski would be the one talking to the girls without any other—would be the one talking to them and not me.

Sheeler Dep. at 54, ECF No. 36-5, PageID.876. Plaintiff's counsel then asked "Kind of like if anyone's messing around with the girls, it would be Janeski?" and Sheeler responded "Yes." *Id.* So that "messing around" quotation originated with Plaintiff's counsel, not Sheeler or Desana. And while Janeski did tell the Sikoras when they were substitute coaching for him to keep Sheeler away from the girls bowling team, he testified that this was because he thought Sheeler would try to interfere and "steal" the girls team while he was way. Janeski Dep. at 79–80, 82–84, ECF No. 36-7, PageID.918–19.  The Sikoras confirmed to Janeski that Sheeler did try to keep coming around the girls team. *Id.*

18

Viewing all these facts in the light most favorable to Martinez, the Court finds that Martinez fails to create a genuine issue of material fact as to whether Wyandotte had actual notice of any potential Title IX liability any earlier than April 18, 2022, when Hinojosa and then Martinez reported Sheeler's February 22nd sexual assault to Wyandotte. The "actual notice" standard set forth in *Gebser* requires more than the knowledge that *some kind* of inappropriate behavior is occurring. It requires actual knowledge that there is a substantial risk of abuse that would give rise to liability under Title IX. At most, Martinez has proffered allegations of knowledge of generally "inappropriate" behavior by Sheeler—being "too chummy," engaging in a group chat, hanging around the girls team, acting "too friendly"—"which was plainly insufficient to alert [Desana] to the possibility that [Sheeler] was involved in a sexual relationship with a student." *See Gebser*, 524 U.S. at 291. This finding is strengthened where most of the alleged behavior was not specifically directed at Martinez, but rather to "the girls" on the bowling team as a whole.

The facts in this case are similar to those in *Campbell v. Dundee Community Schools*, No. 12-cv-12327, 2015 WL 4040743 (E.D. Mich. July 1, 2015) (Levy, J.), *aff'd*, 661 F. App'x 884 (6th Cir. 2016). In *Campbell*, a middle school student was the subject of repeated sexual abuse by her school basketball coach.  The coach began texting Doe and other student players about practical, non-sexual matters. 2015 WL 4040743, at *1.

19

Over time, the texting increased and became sexual in nature and the coach began sneaking into Doe's home to visit her during winter break. *Id.* The coach would sit with Doe in the back of the team bus when going to games and on at least one occasion he engaged in sexual contact with Doe on the bus. *Id.* Parents made complaints to the athletic director about the coach sitting with Doe (but not indicating that any sexual contact had occurred) and the coach was told to stop sitting at the back of the bus with students. *Id.* Another parent complained about the coach's and Doe's relationship—that the coach was showing favoritism to Doe and that Doe had a "crush" on the coach. *Id.* at *2. Then, a school custodian caught the coach and Doe in a custodian's closet engaging in sexual contact, and he reported that to the athletic director, who in turn called both the police and Child Protective Services. *Id.* The coach was arrested, prosecuted, and convicted of criminal sexual conduct and incarcerated. *Id.* The district court granted summary judgment to the defendants on all federal claims, including a Title IX claim, and the plaintiff appealed.

The Sixth Circuit affirmed, and stated:

> The plaintiff argues that actual notice of a substantial risk of sexual harassment or abuse was provided to school officials in a number of ways. These indications include: [the coach's] habit of sitting in the back of the bus with the girls on the team; [the coach] texting and calling the girls on their cell phones; [the student's] "crush" on [the coach]; and the school custodian having a "weird feeling" about [the coach] and [the

> student's] relationship, which the custodian did not report until after the relationship was discovered. [The athletic director] spoke to [the coach] about the behavior after receiving parent complaints, but neither the complaints nor [the athletic director's] talk with [the coach] show any indication that there was a risk of a sexual relationship between [the coach] and [the student]. The complaints were related to preserving the "team dynamic" by not showing favoritism.

661 F. App'x. at 888. The Sixth Circuit explained that "[u]nder the actual notice standard, the plaintiff must be able to show that the authority figures were on notice of a substantial risk of the actual type of harassment that occurred." *Id.* Under the facts in that case, the court found that "the plaintiff did not provide sufficient evidence that either [school official] had actual notice or showed deliberate indifference." *Id.*

Likewise, in *Irvin v. Grand Rapids Public Schools*, 366 F. Supp. 3d 908 (W.D. Mich. 2016), a teacher sent sexually suggestive texts to several students, which progressed to the teacher and several students engaging in sexual encounters, both at school and at other locations. *Id.* at 915. A parent informed a teacher at the school that students were "discussing inappropriate texts being sent between [the teacher] and several students," and identified several students as the victims. *Id.* The court found that the actual notice standard "requires more than knowledge of allegations of 'inappropriate behavior,'" and that the plaintiffs must instead "establish that [the official] was actually aware of a substantial risk of abuse that would give rise to liability under Title IX." *Id.* at 919

21

(finding a report to the school that the teacher was sending "inappropriate texts to students" is not sufficient to supply actual notice). The court concluded that "[b]ecause Plaintiffs have failed to provide any evidence that any Defendant had actual notice of this type of risk before they took action against [the teacher], Plaintiffs fail to establish a critical prong of liability." *Id.* (citing *Gebser*, 524 U.S. at 291–92; *Henderson*, 469 F.3d at 490).

Viewing the evidence in this case in the light most favorable to Martinez, like the plaintiffs in *Gebser*, *Campbell*, and *Ivrin*, Martinez has failed to establish a genuine issue of material fact that Desana had actual notice of the actual type of abuse that occurred in this case, and this failure requires dismissal of her Title IX claim against Wyandotte. "Under current law, the 'substantial risk of abuse' standard is not satisfied by an appropriate person's knowledge that a situation exists in which a teacher could theoretically abuse a student, absent knowledge that there is a substantial risk that abuse will or could actually occur." *Campbell*, 2015 WL 4040743, at *5. Like the plaintiff in *Campbell*, Martinez and Sheeler "intended to keep the relationship secret, and did so successfully" until Martinez reported the abuse. *See Campbell*, 661 F. App'x at 888. The Court therefore will grant Wyandotte summary judgment on Martinez's Title IX claim against it for lack of "actual notice."

22

## 2. Deliberate indifference

A Title IX federal assistance recipient is liable where the recipient "itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment." *Vance v. Spencer Cnty. Pub. Sch. Dist.,* 231 F.3d 253, 260 (6th Cir. 2000). "[T]he deliberate indifference must, at a minimum, 'cause [students] to undergo harassment or make them liable or vulnerable' to it." *Id.* (quoting *Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 645 (1999)). "[A] plaintiff may demonstrate [a] defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Id.* (citing *Davis,* 526 U.S. at 648); *see also Doe v. Plymouth-Canton Cmty. Schs.*, No. 19-10166, 2022 WL 1913074, at *10 (E.D. Mich. June 3, 2022) (Levy, J.) ("Deliberate indifference under Title IX is a 'high bar' that only requires that school administrators respond to known student-on-student harassment in a manner that is not 'clearly unreasonable in light of the known circumstances.'") (quoting *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016)).

"The recipient is not required to 'remedy' sexual harassment nor ensure that students conform their conduct to certain rules, but rather, 'the recipient must merely respond to known ... harassment in a manner that is not clearly unreasonable.'" *Vance,* 231 F.3d at 260 (citing *Davis,* 526 U.S. at 648–49). Still, it is insufficient to simply investigate and do

23

nothing more in response to an allegation of abuse. *Id.* A school is therefore deliberately indifferent if it is "aware of the misconduct" but does "nothing to stop it, despite its ability to exercise control over the situation." *Horner v. Ky. High Sch. Athletic Assn.*, 206 F.3d 685, 692 (6th Cir. 2000). The Court asks whether the school's response was clearly unreasonable considering the information available to it. *Id.*

Wyandotte argues that because there was no notice to the school officials of a risk of sexual abuse occurring prior to April 18, 2022, and it then acted promptly and appropriately in response, there was no deliberate indifference toward the risk. ECF No. 36, PageID.734–35 (citing *Campbell*, 661 F. App'x at 888). Indeed, Martinez and Sheeler successfully kept their relationship secret until April 18, 2022. The Court agrees that because Martinez is unable to create a material question of fact as to whether Desana, and thus Wyandotte, knew of the sexual abuse by Sheeler prior to April 18, 2022, at which time Wyandotte promptly investigated, reported Sheeler to the police, and he resigned, Wyandotte was not deliberately indifferent toward that known risk. *See Campbell*, 661 F. App'x at 888. Thus, assuming actual notice on April 18, 2022, when Defendants learned of the abuse, they acted promptly and responsibly to prevent further abuse. *See Irvin*, 366 F. Supp. 3d at 920–21 (prompt and reasonable response by district precluded a finding of deliberate indifference). Martinez therefore fails to present evidence creating a genuine issue of fact that Wyandotte's response was "clearly

24

unreasonable in light of the known circumstances." *See McCoy v. Board of Educ., Columbus City Schs.*, 515 F. App'x 387, 392 (6th Cir. 2013) ('In hindsight, the school district could certainly have done more. But this is not the standard by which [the court] impose[s] liability.").

Martinez's Title IX claim against Wyandotte therefore will be **DISMISSED WITH PREJUDICE.**

### B. Violation of 42 U.S.C. § 1983 – Equal Protection, Against Defendants Desana and Janeski (Count III)

Martinez alleges that Defendants Desana and Janeski are liable under 42 U.S.C. § 1983 in their individual capacities for violation of Martinez's right to personal security and bodily integrity. Complaint, Count III, ECF No. 1. She alleges that Sheeler violated her right to be free from sexual assault, and that Defendants Desana and Janeski are liable for their failure to supervise Sheeler and "to report" Sheeler or "otherwise act" "to prevent further harm to [Martinez]." *Id.*

To be liable for a constitutional violation, a defendant must have committed the violation through their "own individual actions." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 490 (6th Cir. 2020). A defendant cannot be held liable based on "proximity" to wrongdoing or under respondeat superior principles. *Id.* Rather, because liability in a § 1983 actions must be based on "active unconstitutional behavior," to establish individual supervisory liability under § 1983, a plaintiff must show that "the supervisor encouraged the specific incident of misconduct or in some

25

other way directly participated in it, or at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) (citation modified). Liability "must be based on more than the right to control employees. Likewise, simple awareness of an employee's misconduct does not lead to supervisor liability." *Id.*

"In the educational context, a 'plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse showed a strong likelihood that he would attempt to sexually abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students.'" *Irvin*, 366 F. Supp. 3d at 924–25 (quoting *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002)). A plaintiff "must establish that the "defendants' conduct amounted to a tacit authorization of the abuse[,]'" and "liability must be based on active unconstitutional behavior, and ... a mere failure to act [is] not sufficient.'" *Id.* (citations omitted). Further, "[i]t is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless, or negligent in the performance of their duties." *City of Roseville*, 296 F.3d at 439. Rather, "a plaintiff must show that, in light of the information the defendants possessed, the teacher who engaged in the sexual abuse showed a strong likelihood that he [or she] would attempt to sexually abuse other students, such that the failure to take adequate precautions amounted to

26

deliberate indifference to the constitutional rights of the students." *Id.* (quoting *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 513 (6th Cir. 1996)). Put differently, the defendants' conduct must amount to "a tacit authorization of the abuse." *Id.* (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)).

Accordingly, to assert a § 1983 supervisory liability claim against Desana and Janeski in this case, Martinez must establish that those Defendants encouraged, participated in, or implicitly authorized, approved, or knowingly acquiesced in Sheeler's abuse of her. *See Leary*, 349 F.3d at 903. However, as discussed above, Martinez has failed to present a genuine issue of material fact that either Janeski or Desana had actual knowledge of the abuse or sexual contact between Sheeler and Martinez prior to the disclosure by Martinez and Hinojosa to school administrators on April 18, 2022. Viewing the evidence in the light most favorable to Martinez, at most, Desana and Janeski were aware that Sheeler engaged in a "group chat" with the girls on the bowling team (which included Martinez), Sheeler was reported to be "too chummy" or "too close" to the girl bowling team members, and there was a one-time "hand gesture" between Sheeler and Martinez during a bowling practice that Janeski observed but did not report to Desana and which he did not think was sexual in nature at the time he saw it.

This evidence of generalized complaints of "inappropriate" behavior by Sheeler involving the girls on the bowling team in general fails as a

27

matter of law to establish that Janeski or Desana encouraged, participated in, or implicitly authority, approved, or knowingly acquiesced in Sheeler's intentional misconduct with respect to Martinez. *See Campbell*, 661 F. App'x at 889–90 (individual defendants were entitled to qualified immunity because they "had no reason to believe that [the plaintiff] was being sexually assaulted or molested by [her coach] because she and [her coach] successfully hid their relationship"); *Irvin*, 366 F. Supp. 3d at 925 ("Plaintiffs have failed to establish that Defendants encouraged, participated in, or implicitly authorized, approved, or knowingly acquiesced in [the teacher's] misconduct" because "within hours after receiving notice of the misconduct, all of the Defendants participated in investigating the allegations, contacting law enforcement, and removing [the teacher] from the school premises."); *see also City of Roseville*, 296 F.3d at 440–41 (concluding that "[a]lthough [the plaintiff] had a constitutional right to be free from sexual abuse at the hands of a school teacher or official, she did not have a constitutional right to be free from negligence in the supervision of the teacher who is alleged to have actually abused her[, as n]egligence is not enough to impose section 1983 liability on a supervisor."); *Columbus City Schs.*, 2025 WL 888461, at *13 (dismissing § 1983 claim against school principal based on her "failure to act," because "[s]he never knowingly acquiesced in—much less participated in, encouraged, or authorized—[the teacher's] harassment of [the plaintiff].").

28

The undisputed evidence establishes that once Defendants had actual notice of the reported abuse, they reacted promptly to investigate the allegations, contact law enforcement, and ensure Sheeler was not permitted on the school premises. Accordingly, Martinez fails to support a claim that Desana and Janeski deprived her of a right secured by the Constitution, and Count III of Martinez's Complaint will be **DISMISSED**.

Defendants further argue that, to the extent Martinez alleges that "[f]emale students, and Plaintiff in particular, were not treated in the same manner as male students" by Janeski and Desana, she fails to state a claim for violation of her equal protection rights because she fails to provide sufficiently specific allegations or evidence as to any alleged "disparate" treatment. ECF No. 36, PageID.739–40. Martinez responds only that "sexual harassment could violate rights protected by the equal protection clause." ECF No. 40, PageID.1183–84. She does not, however, offer any evidence that Janeski or Desana treated a similarly situated person better than they treated Martinez. Thus, to the extent Martinez asserts an equal protection claim against Desana and Janeski, they are entitled to summary judgment on that claim.

### C. *Monell* Liability Against Wyandotte (Count IV)

Martinez also asserts a municipal liability claim against Wyandotte for violation of 42 U.S.C. § 1983. Complaint, Count IV, ECF No. 1, PageID.33–38.

29

To succeed on her municipal liability claim against Wyandotte, Martinez must show (1) she was deprived of a constitutional right; and (2) that Wyandotte is responsible for that violation. *Claiborne Cnty.,* 103 F.3d at 505–06. Martinez has asserted that Wyandotte is liable to her through § 1983 for violation of her right to personal security and bodily integrity. Sexual abuse by a public-school teacher violates both the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. *Irvin*, 366 F. Supp. 3d at 925–26 (citations omitted); *see also Claiborne Cnty.*, 103 F.3d at 507 ("We therefore hold that [plaintiff] had a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity, that such right is fundamental, and that [the teacher's] sexual abuse of [the plaintiff] violated that right."). Martinez therefore satisfies the first prong.

Under the second prong, Martinez must establish either that "an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Claiborne Cnty.,* 103 F.3d at 507 (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91 (1978)). This is because "a municipality cannot be held liable [under section 1983] solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

30

Rather, to establish municipal liability under *Monell*, Martinez must establish the existence of a policy or custom based on "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Franklin v. Franklin Cnty.*, 115 F.4th 461, 470 (6th Cir. 2024) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). Martinez must also demonstrate a "direct causal link" between the policy or custom and "the constitutional deprivation." *Claiborne Cnty.*, 103 F.3d at 508.

Martinez alleges that Wyandotte is liable for her sexual assault by Sheeler because of its failure to train and supervise its employees, including Sheeler, Janeski, and Desana, "in the constitutional requirements for sexual discrimination, Title IX, sexual abuse, misconduct and/or abuse, reporting of same, disparate treatment of students on the basis of sex, and the fundamental contours of the Fourth and Fourteenth Amendments." Complaint, Count IV, ECF No. 1, PageID.33–38; *see also* ECF No. 40, PageID.1185 (asserting that "WPS failed to adequately train and/or supervise its employees, administrators, directors, and coaches, including Defendants, Sheeler, Janeski, and Desana, in the constitutional requirements for preventing sexual assault,

31

discrimination, sexual misconduct and/or abuse, reporting of same, and the fundamental contours of the Fourth and Fourteenth Amendments.").[4]

To establish municipal liability based on inadequate supervision or training, Martinez "must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Franklin*, 115 F.4th at 474. To demonstrate deliberate indifference with

---

[4]    Defendants also argue in their motion that to the extent Martinez's *Monell* claim can be construed as relying on a "theory of inaction," that claim fails. ECF No. 40, PageID.741–44. When a plaintiff relies on a theory of inaction by the municipality, he or she must show (1) a clear and persistent pattern of conduct, (2) notice or constructive notice of that conduct by the municipal entity, (3) tacit approval of the conduct by the entity such that its deliberate inaction in the failure to act can be said to constitute an official policy or custom of inaction, and (4) the policy or custom of inaction was the moving force or direct cause of the constitutional deprivation. *See Claiborne Cnty.*, 103 F.3d at 508. Defendants argue that there are no genuine issues of material fact as to whether there existed a "clear and persistent pattern of sexual abuse" by Sheeler or other employees of which Wyandotte had "notice or constructive notice" and thus a "failure to act" claim fails. *Id.* The Sixth Circuit has explained that "[a] lack of knowledge of … sexual misconduct that was successfully concealed for almost a year is not a 'custom' of [a school district].'" *Campbell*, 661 F. App'x at 889. Defendants state that when the sexual abuse by Sheeler was discovered, Defendants reported it to the police and Sheeler was promptly removed from the building. Martinez fails to address this argument in her Response, focusing instead on a claim for failure to train or supervise. In any event, because Martinez fails to demonstrate a "clear and persistent pattern of sexual abuse," as discussed *infra*, the Court agrees that a *Monell* claim based on a "theory of inaction" would fail.

32

respect to such claims, Martinez must show that the failure to train or supervise was either in a situation where the consequences from lack of training or supervision were foreseeable or where a municipality failed to address repeated constitutional violations by its employees. *See id.*

Martinez contends that Sheeler and Janeski admitted that they never received training from Wyandotte, including training regarding the Michigan Child Protection Act, and that while Desana testified he participated in annual training, that training did not include child abuse or child protection reporting requirements. ECF No. 40, PageID.1185–89. Martinez further argues that several prior instances of abuse in Wyandotte schools demonstrate that, absent adequate training and supervision, unconstitutional conduct is recurring and foreseeable. *Id.* PageID.1189–91.

Defendants assert that Janeski, Desana, Reynolds, Sevcik, and teachers Susi Stiles and Jennifer Ferris all testified that they were trained on or aware of the requirements and procedures for reporting suspected abuse of a student. ECF No. 36, PageID.746–47 (citing Janeski Dep. at 23, 123, ECF No. 36-7, PageID.904, 929 (admitting he received annual MHSAA training, which included Title IX training and a module on sexual discrimination or sexual harassment); Desana Dep. at 23–24, ECF No. 36-3, PageID.783 (stating he was very familiar with Title IX and completed annual sexual harassment training); Reynolds Dep. at 26–27, ECF No. 36-9. PageID.972 (stating teachers are required to have formal

33

training annually on "Title IX, sexual harassment and child protection laws"); Ferris Dep. at 22–23; ECF No. 36-12, PageID.1018 (stating requirements for mandated reporting were discussed at staff meetings); Stiles Dep. at 40–44, ECF No. 36-13, PageID.1035–36 (discussing her obligations as a mandated reporter and training at mandatory in-service meetings); Deposition of Paige Sevcik at 20–21, ECF No. 36-8, PageID.956–57 (she received annual training on sexual abuse and sexual harassment)).

However, even accepting as true Martinez's allegations that Sheeler, Janeski, and Desana did not receive proper training for purposes of Defendants' motion for summary judgment, "a systematic failure to train employees amounts to a custom or policy for which the employer may be subject to § 1983 liability only if such failure amounts to deliberate indifference to the rights of persons with whom the employees come into contact." *Savoie v. Martin*, 673 F.3d 488, 494–95 (6th Cir. 2012) (citing *Miller v. Sanilac Cnty.*, 606 F.3d 240, 255 (6th Cir. 2010)). "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [employer] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Id.* (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). Under § 1983, constitutional claims are "most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "The standard of

'deliberate indifference' is a stringent one that requires proof that the defendants 'disregarded a known or obvious consequence' of their actions." *Sagan v. Sumner Cnty. Bd. of Educ.*, 726 F. Supp. 2d 868, 886 (M.D. Tenn. 2010).

Martinez refers to "customs or policies" that allowed Sheeler to communicate unsupervised with students through communication applications and on school-issued computers and allowed male coaches to sit on the bus next to female students to and from bowling matches. Complaint, ECF No. 1, PageID.34–36. Defendants argue these alleged customs or policies fail to subject Wyandotte to municipal liability under § 1983 because Martinez cannot establish that they were the cause of her alleged constitutional violation—her "right to personal safety and bodily integrity." ECF No. 36, PageID.743. As Defendants explain, at best, the alleged customs provided an *opportunity* for Sheeler's alleged unlawful conduct, but the Sixth Circuit has stated that "[o]pportunity alone, however, fails to show that the [defendant's] custom 'direct[ly]' caused the assault." *Franklin*, 115 F.4th at 471.

In *Franklin*, the plaintiff brought municipal liability claims, asserting she was sexually abused by a jail sergeant due to the jail's "practice of permitting one male officer to transport a lone female inmate." *Id.* at 470. The Sixth Circuit held that the plaintiff must "'show that the particular injury [the assault] was incurred *because* of the execution of that policy [or custom].'" *Id.* at 471 (quoting *Claiborne Cnty.*,

35

103 F.3d at 508). The court found that the plaintiff "fails to show how her assault was 'a direct result of [the Jail's] … custom,' as opposed to [the jail sergeant's] unilateral, unlawful actions," and instead "shows only that the Jail's transportation custom provided the opportunity for [the jail sergeant's] unlawful behavior," which is insufficient to establish *Monell* liability. *Id.*; *see also Mize v. Tedford*, 375 F. App'x 497, 501 (6th Cir. 2010) ("Mize responds that the department did not supervise Tedford closely and that, had the department given him less free rein, he might not have had the opportunity to rape her. Maybe so. But opportunity alone, without reason to suspect that it will lead to a constitutional violation, does not establish deliberate indifference. At best, it establishes negligence, which 'will not suffice.'") (citation omitted); *Petty v. Garden City Pub. Schs.*, No. 21-cv-11328, 2025 WL 723028 at *10 (E.D. Mich. Mar. 6, 2025) (Levy, J.) (finding that defendant's custom of allowing the teacher to be alone with students and take them off school grounds alone cannot establish municipal liability for the school because the alleged policy only gave the teacher the opportunity to commit acts of sexual abuse, but was not a direct cause of that abuse, the teacher was). The Sixth Circuit has explained that:

> The Supreme Court has required the higher standard precisely because of cases like this one, recognizing that "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have

> done' to prevent the unfortunate incident." *City of Canton [v. Harris],* 489 U.S. [378,] 392 [(1989)]. To allow such claims, without more, would create the kind of "*de facto respondeat superior* liability" that the Court has made clear does not exist in this area. *Id.*

*Mize*, 375 F. App'x at 501. Similarly, in this case, the alleged communications or transportations "customs" or "policies" Martinez complains about at best provided Sheeler an opportunity to commit acts of sexual abuse, but were not the direct cause of that abuse, Sheeler was, and thus those alleged customs or policies cannot establish *Monell* liability against Wyandotte.

Martinez further argues that several prior instances of abuse demonstrate that absent adequate training and supervision, unconstitutional conduct is recurring and foreseeable. ECF No. 40, PageID.1189–91. As stated above, to demonstrate deliberate indifference with respect to failure to train and supervise claims, a plaintiff must show that the consequences from lack of training or supervision were foreseeable or that the municipality failed to address repeated constitutional violations by its employees. *See Franklin*, 115 F.4th at 474. In her Response, Martinez purports to list five prior instances of abuse at Wyandotte schools that should have demonstrated to Wyandotte that its training was inadequate. ECF No. 40, PageID.1189–90. For the reasons discussed next, these alleged incidents are insufficient to create a genuine issue fact. They do not demonstrate that Wyandotte has ignored a history of abuse and was clearly on notice that the training in

37

this particular area was deficient and likely to cause the injury in this case—sexual abuse and assault of a student. *See Mize*, 375 F. App'x at 501 (finding that "four to five complaints" against other employees for different misconduct fails to demonstrate that employee's rape was foreseeable). Each incident will be considered in turn.

Martinez asserts that in 2017, the school learned that a female teacher was sending inappropriate texts to a male student. Cost Dep. at 67–68, ECF No. 36-10, PageID.1003. Contrary to Martinez's assertions in her Response brief, Cost did not characterize the texts at issue in that matter as "sexting" or state that the teacher was "arrested." *See id.* Nevertheless, upon learning of the incident, Wyandotte placed the teacher on administrative leave and the district instructed school principals to discuss with teachers how to communicate safely with students. *Id.*

Martinez next refers to an incident in 2019 where she alleges that a parent complained that a volunteer, who was a convicted felon, "was bringing Valentine's treats to his daughter and three of her friends at school." This volunteer was subsequently charged with sexual assault of 15 children outside of the school setting. ECF No. 40, PageID.1189, citing Cost Dep. at 70, ECF No. 36-10, PageID.1004. However, Cost testified that after this incident, the school board had an independent investigation conducted which found no negligence on behalf of the school district. Cost Dep. 72–73, ECF No. 36-10, PageID.1004. The district

amended its policy to no longer allow any convicted felons to serve as volunteers at a school. *Id.*

Martinez also refers to two other dissimilar incidents—one involving a boys' basketball coach physically assaulting a player during practice and another involving a male coach drinking in a car driven by a student. ECF No. 40, PageID.1190, citing Desana Dep. at 32–36, ECF No. 36-3, PageID.785–86. Desana testified that he investigated both incidents, reported both incidents to his supervisor, Ben Reynolds, and the coaches were fired. *Id.*[5]

These incidents, far from demonstrating that Wyandotte ignored a history of abuse and that it was on actual or constructive notice that its training and policies were deficient, demonstrate the opposite. In all the incidents, the allegations, once known to the school, were investigated and appropriate disciplinary action was taken. *See Irvin*, 366 F. Supp. 3d at 928 (plaintiff failed to establish that the school's training was deficient and that any alleged deficiency led to the misconduct at issue because "every time an allegation of sexual abuse or harassment occurred, [the school's] administrators and personnel promptly responded to the

---

[5] Martinez purports to refer to another incident in 2022 involving a male special education teacher at RHS harassing and inappropriately touching a 14-year-old student, with no investigation resulting, no report to CPS, and that this teacher was subsequently convicted of soliciting minors. ECF No. 40, PageID.1190. However, Martinez fails to provide any support for those allegations, and thus this alleged incident will not be considered.

allegations, notified law enforcement officials, and terminated the offending employees"); *Doe v. Centreville Pub. Schs.*, No. 1:17-cv-317, 2019 WL 10890258, at *8 (W.D. Mich. Apr. 29, 2018) (school district entitled to summary judgment on plaintiff's equal protection claim because its responses to two prior known incidents "were not so unreasonable as to be deliberately indifferent" and did not provide notice "that school employees generally or Miller specifically, was a threat to students").

Finally, Martinez's attempt to rely on a "single violation" theory in support of her failure to train and supervise claim also fails. As discussed *supra*, Martinez has provided no evidence that Wyandotte knew or should have known of Sheeler's unconstitutional conduct and ignored a history of abuse until Hinojosa and then Martinez reported it in April 2022, at which time Wyandotte promptly and appropriately investigated and responded. The standard of "deliberate indifference" is a stringent one and requires proof that the defendants "disregarded a known or obvious consequence" of their actions. *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 410 (1997); *see also Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962, 970 (6th Cir. 2006) (dismissing claim under "single violation" theory because "[t]he intentional, violent act [a sexual assault] that a custodian performed far outside the scope of his duties cannot be something that was 'obvious' to occur"). Moreover, courts have found that "[t]he absence of deliberate indifference pursuant to a Title IX

claim is fatal to a companion municipal liability claim made under § 1983." *McCoy*, 515 F. App'x at 393 (citing *Henderson*, 469 F.3d at 492); *see also Plymouth-Canton Cmty. Schs.*, 2022 WL 1913074, at *14 (dismissing plaintiff's municipal liability claim for failure to establish deliberate indifference under Title IX).

Accordingly, Martinez has failed to raise a genuine issue of material fact creating a viable *Monell* claim against Wyandotte, so that summary judgment must be granted on this claim.

### D. Violation of the Michigan ELCRA Against Wyandotte (Count VII)

Martinez asserts a claim against Wyandotte for violation of the Michigan ELCRA for failing to protect her against a sexually hostile educational environment. Complaint, Count VII, ECF No. 1, PageID.43–46. She asserts that Wyandotte is "vicariously liable for the acts and omissions of its employees, staff, coaches, director, and administrators, including Defendants Sheeler, Desana, and Janeski under the doctrine of *respondeat superior*." *Id.*

Wyandotte argues that neither Janeski nor Desana engaged in any direct acts of sexual harassment of Martinez for which Wyandotte could be vicariously liable, and thus Wyandotte focuses on Martinez's claim of vicarious liability against Wyandotte based on the conduct of Sheeler. ECF No. 36, PageID.749 & fn.3. This is appropriate as Martinez does not offer any evidence of any independent tort committed by Janeski or

41

Desana for which Wyandotte could be vicariously liable. Wyandotte disputes that it is vicariously liable for Sheeler's intentional misconduct under the ELCRA. *Id.* PageID.749–51.

Under the doctrine of respondeat superior in Michigan, "[a]n employer is generally liable for the torts its employees commit within the scope of their employment." *Hamed v. Wayne Cnty.*, 803 N.W.2d 237, 244 (Mich. 2011). The Michigan Supreme Court has explained that because M.C.L. § 37.2401 defines "educational institution" to include, among other things, "an agent of an educational institution[,] … with a hostile-educational-environment claim, … [the court] start[s] from the premise that a plaintiff is required to establish respondeat superior." *Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*, 28 N.W.3d 613, 618 (Mich. 2024) (rejecting the view that educational defendants may be held vicariously liable under the *in loco parentis* doctrine). Under this doctrine, an employer is not vicariously liable for the torts committed by an employee when those torts are beyond the scope of the employer's business. *Hamed*, 803 N.W.2d at 244. "Independent action, intended solely to further the employee's individual interests, cannot be fairly characterized as falling within the scope of employment." *Id.* at 244.

There are, however, exceptions to this rule. An employer may be liable in negligence for an employee's criminal conduct if the employee's particular criminal conduct was reasonably foreseeable, such as if the employee had committed similar criminal conduct in the past, or if the

42

employee "clearly and unmistakably threaten[ed] particular criminal activity that would have put a reasonable employer on notice of an imminent risk of harm to a specific victim." *Brown v. Brown*, 739 N.W.2d 313, 318 (Mich. 2007). Similarly, an employer can be liable for its employee's criminal conduct under a theory of respondeat superior if the "employer had (1) actual or constructive knowledge of prior similar conduct and (2) actual or constructive knowledge of the employee's propensity to act in accordance with that conduct." *Hamed*, 803 N.W.2d at 245. The Michigan Supreme Court, however, has cautioned against transforming "the test of foreseeability into an 'avoidability' test that would merely judge in hindsight whether the harm could have been avoided." *Brown*, 739 N.W.2d at 318–19.

Applying these principles to the facts before it, the Michigan Supreme Court in *Hamed* found that "there is no question that [the deputy's] sexual assault of the plaintiff was beyond the scope of his employment as a deputy sheriff" because "[t]he sexual assault was an independent action accomplished solely in furtherance of [the deputy's] own criminal interests" and "[i]t cannot be said that any of the institutional defendants benefited in any way from [the deputy's] criminal assault or his exercise of unlawful authority over plaintiff." *Id.* at 244–45. The court then found that an exception to this rule did not apply because even though the deputy had prior complaints against him, "which put defendants on notice of [the deputy's] irresponsible and

aggressive tendencies, … Defendants had no actual or constructive knowledge of prior similar criminal sexual misconduct." *Id.* at 247. "Because [the deputy's] prior misconduct was not similar to the violent sexual assault he perpetrated against plaintiff," the defendants could not be held vicariously liable for the deputy's "unforeseeable criminal act under traditional principles of respondeat superior." *Id. See also Brown*, 739 N.W.2d at 318 (holding that the employer was not vicariously liable for a rape committed by its employees as the act was unforeseeable even through the employee repeatedly made sexually offensive comments to the plaintiff, and then subsequently raped her, because an employer "cannot reasonably anticipate that an employee's lewd, tasteless comments are an inevitable prelude to rape if those comments did not clearly and unmistakably threaten particular criminal activity that would have put a reasonable employer on notice of an imminent risk of harm to a specific victim"). The Michigan Supreme Court has recognized that "[c]omments of a sexual nature do not inexorably lead to criminal sexual conduct any more than an exasperated, angry comment inexorably results in a violent criminal assault." *Brown*, 739 N.W.2d at 318.

Applying those principals to this case, Sheeler's sexual abuse and assault of Martinez was plainly beyond the scope of his employment with Wyandotte. And there is no evidence that Defendants had actual or constructive knowledge of prior sexually abusive conduct by Sheeler, or

44

actual or constructive knowledge of his propensity to sexually abuse or assault a student. Wyandotte's alleged knowledge of "inappropriate" text messages, participation in group chat, or being "too chummy" or "too close" to the girls' bowling team is simply insufficient to provide actual or constructive knowledge that Sheeler would sexually assault Martinez. *See Hamed*, 803 N.W.2d at 247; *Brown*, 739 N.W.2d at 318. Wyandotte therefore cannot be held vicariously liable for Sheeler's conduct under the ELCRA.

Martinez argues in her Response that Defendants have failed to argue that Martinez does not have a "direct liability" claim against Wyandotte. ECF No. 40, PageID.1191–92, citing *Doe by Next Friend Kolokithas v. Alpena Pub. Sch. Dist.*, No. 359190, 2025 WL 1112610 (Mich. Ct. App. Apr. 14, 2025). Wyandotte disputed in its reply brief, and again at the hearing, that Martinez plead this claim in her Complaint. ECF No. 44, PageID.1353. Indeed, in her Complaint, Martinez pleads that Wyandotte "is vicariously liable for the acts and omissions of its employees, staff, coaches, director, and administrators, including Defendants SHEELER, DESANA, and JANESKI under the doctrine of *respondeat superior*." Compl. ¶ 186, ECF No. 1. In any event, in *Kolokithas*, the Michigan Court of Appeals did hold "that the ELCRA permits hostile-educational-environment harassment claims under direct-liability theories," but stated that "an educational institution is not liable if it shows that it took prompt and appropriate remedial action in

45

response to the complainant's claims." *Alpena Pub. Sch. Dist.*, 2025 WL 1112610, at *1. As established *supra*, Wyandotte took prompt and appropriate remedial action as soon as it had notice of Martinez's complaint about Sheeler's sexual abuse. To the extent properly pleaded, Martinez's direct liability claim under the ELCRA therefore also fails as a matter of law and Wyandotte is therefore entitled to summary judgment on that claim.

### E. Michigan Child Protection Law (Count VIII)

Finally, Martinez asserts a claim against Defendants Wyandotte, Desana, and Janseki for violation of the Michigan Child Protection Law ("CPL"), M.C.L. § 722.621 *et seq.* Complaint, Count VIII, ECF No. 1, PageID.46–48. The CPL makes certain individuals mandatory reporters of child abuse to Michigan's Child Protective Services program. Among them are school administrators and school counselors or teachers. M.C.L. § 722.623(1)(a). Mandatory reporters "who [have] reasonable cause to suspect child abuse or neglect shall make immediately, by telephone or otherwise, an oral report, or cause an oral report to be made, of suspected child abuse or neglect to the department. Within seventy-two hours after making the oral report, the reporting person shall file a written report as required in this act." *Id.* "A person who is required by this act to report an instance of suspected child abuse or neglect and who fails to do so is civilly liable for the damages proximately caused by the failure." M.C.L. § 722.633(1).

### 1. Janeski

Defendants argue that M.C.L. § 722.623(a)(1)(a) lists the professionals who are mandated reporters under the CPL, including "school administrator" and "school teacher," and that Janeski, who was contracted by Wyandotte as the head coach of the girls' bowling team, but is not a "school administrator" or "school teacher,' is not included in that list as a "mandated reporter" under the CPL. ECF No. 36, PageID.752–53. Michigan courts, in recognizing "the Legislator's clearly expressed intent to limit mandatory reporters to a clearly defined group of professionals," have declined to expand mandatory reporters to include "one whose job title may not be identified in MCL 722.623(1)(a), but whose function in a particular setting is similar to that of an identified mandatory reporter" *See Gohl v. Turbiak*, No. 335389, 2018 WL 2067796, at *11 (Mich. Ct. App. May 3, 2018) ("declin[ing] to expand the meaning of 'teachers' to include paraprofessionals and ancillary service staff").

Janeski, as a contracted "coach" of Wyandotte's girls bowling team, is not included in the list of mandatory reporters under the CPL, and accordingly, Martinez's failure-to-report claim against Janeski will be **DISMISSED**. The Court further finds that, even if Janeski were deemed a mandated reporter under the CPL, he would be entitled to governmental immunity against Martinez's CPL claim for the same reasons as Desana, as discussed *infra*.

47

### 2. Wyandotte

Defendants argue that Wyandotte is entitled to governmental immunity as to Martinez's CPL claim against it under Michigan's Governmental Tort Liability Act ("GTLA"). ECF No. 36, PageID.753–55.

The GTLA extends immunity to governmental agencies and employees or agents of governmental agencies. M.C.L. § 691.1407(1) ("Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function."); *see also Mack v. City of Detroit*, 649 N.W.2d 47, 55–56 (Mich. 2002) (recognizing the "presumption that a governmental agency is immune"). Because Wyandotte is a "governmental agency" under the GTLA, it is entitled to the presumption of absolute immunity to Martinez's claims based on state law. *See Nalepa v. Plymouth-Canton Cmty. Sch. Dist.*, 525 N.W.2d 897, 901 (Mich. Ct. App. 1994) ("[A] school district is a level of government of the type contemplated by the Legislature in the statute regarding absolute governmental immunity."), *aff'd on other grounds sub nom. Nalepa v. Encyclopedia Britannica Educ. Corp.*, 548 N.W.2d 625 (Mich. 1995).

The only exceptions to agency governmental immunity are (1) maintenance of public highways, M.C.L. § 691.1402; (2) negligent operation of a government-owned motor vehicle, M.C.L. § 691.1405; (3) public building defects, M.C.L. § 691.1406; (4) performance of

48

proprietary functions by government entities, M.C.L. § 691.1413; (5) medical care or treatment provided to a patient, M.C.L. § 691.1407(4); and (6) sewage disposal system events, M.C.L. § 691.1417. None of these exceptions apply to Martinez's claims. Further, the Michigan Court of Appeals has held that the CPL does not abrogate GTLA immunity, because the GTLA was later-enacted. *Jones v. Bitner,* 832 N.W.2d 426, 427 (Mich. Ct. App. 2013).

"[I]t is the responsibility of the party seeking to impose liability on a governmental agency to demonstrate that its case falls within one of the exceptions." *Mack*, 649 N.W.2d at 56. Martinez has not met that burden here, and accordingly Wyandotte is entitled to summary judgment on this claim. *See Nelson-Molnar v. Ann Arbor Pub. Schs.*, No. 23-CV-11810, 2024 WL 2059709, at *9 (E.D. Mich. May 8, 2024) (Steeh, J.) (school district entitled to governmental immunity for plaintiff's claim for failure to report child abuse under the CPL).

### 3. Desana

Defendants further argue that Desana is entitled to immunity under the GTLA from Martinez's CPL claim. ECF No. 36, PageID.755–57. Defendants contend that there is no evidence that Desana acted with gross negligence that was the proximate cause of Martinez's alleged injuries. *Id.*

Under the GTLA, other governmental employees and agents are immune from tort liability if they (a) are acting or reasonably believe they

are acting within the scope of their authority; (b) the governmental agency for which they work is engaged in the exercise or discharge of a governmental function; and (c) "[t]he officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage." M.C.L. § 691.1407(2). Michigan courts read "the proximate cause" under the GTLA to require that the cause be "the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit,* 613 N.W.2d 307, 317 (Mich. 2000). "Ordinarily, the determination of proximate cause is left to the trier of fact, but if reasonable minds could not differ regarding the proximate cause of the plaintiff's injury, the court should rule as a matter of law." *Babula v. Robertson,* 536 N.W.2d 834, 839 (Mich. Ct. App. 1995).

Courts have applied the proximate cause standard under the GTLA in school settings. In *Campbell v. Dundee Community Schools*, No. 12-cv-12327, 2015 WL 4040743 (E.D. Mich. July 1, 2015) (Levy, J.), *aff'd*, 661 F. App'x 884 (6th Cir. 2016), the court stated "[w]here a child is abused by a third party, the third party is *the* proximate cause, and the governmental employee will not be held liable." *Id.* at *12. The court in that case thus dismissed the plaintiff's CPL claim against the school district's athletic director because the coach who abused the plaintiff was the proximate cause of her injuries, not the athletic director. *Id.*

In *Miller v. Lord,* 686 N.W.2d 800 (Mich. Ct. App. 2004) and *Gray v. Cry,* No. 291142, 2011 WL 4375074 (Mich. Ct. App. Sept. 20, 2011), the

50

Michigan Court of Appeals applied this proximate cause standard to the school setting. The *Miller* court held that even gross negligence by teachers that resulted in the sexual assault of one student by another student was not *the* proximate cause of the student's injuries, as the student rapist was the actual proximate cause. *Miller,* 686 N.W.2d at 802. And in *Gray,* the Michigan Court of Appeals found that a teacher who encouraged students to fight in a school weight room was not *the* proximate cause of a student's injuries, as the other student in the fight was the most immediate, efficient, and direct cause preceding any injury. *Gray,* 2011 WL 4375074, at *3–4. The individual defendants in those cases were therefore granted immunity under the GTLA.

Accordingly, where a child is abused by a third party, such as in this case, the third party is *the* proximate cause of the child's injuries, and the governmental employee will not be held liable. *Campbell,* 2015 WL 4040743 at *12. Here, because Sheeler abused Martinez, he is the proximate cause of her injuries, and Desana therefore may not be held liable under the CPL, and he is therefore entitled to summary judgment on this claim.

## IV.   CONCLUSION

For the reasons stated above, Defendants The School District of the City of Wyandotte, Thomas Desana, and Martin Janeski's Motion for Summary Judgment, ECF No. 36, will be **GRANTED** and Plaintiff's

51

52

claims against those Defendants will be **DISMISSED WITH PREJUDICE**.

This is not a final order and does not close the case.

**IT IS SO ORDERED.**

Dated: March 16, 2026      /s/Terrence G. Berg
                           HON. TERRENCE G. BERG
                           UNITED STATES DISTRICT JUDGE